IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


| | | |
|---|---|---|
| WILLIE ADAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:10cv924-MHT |
| | ) | (WO) |
| THE CITY OF MONTGOMERY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Willie Adams brings this employment-discrimination lawsuit against defendant City of Montgomery, Alabama, charging it with race discrimination and retaliation in violation of Title VII (Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 1981a & 2000e-2000e-17) and § 1981 (the Civil Rights Act of 1866, 42 U.S.C. § 1981, as enforced through 42 U.S.C. § 1983).[1]  Jurisdiction is proper under 42 U.S.C.

---

1.  "[Section] 1983 constitutes the exclusive federal remedy for violation by state actors of the rights guaranteed under § 1981."  Bryant v. Jones, 575 F.3d 1281, 1288 n. 1 (11th Cir. 2009).

§ 2000e-5(f)(3) and 28 U.S.C. § 1343.  This cause is now before the court on the city's motion for summary judgment.  For the reasons that follow, the motion will be granted in part and denied in part.


## I.  SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).


## II.  BACKGROUND

Adams, an African-American, first worked for the City of Montgomery from September 2003 to August 2004.  After a stint as a long-distance truck driver, he returned to

work for the city on August 10, 2007, as a Service
Maintenance Worker I ("SMW I"). Because his gap in
municipal employment was several years long, he was
rehired as a temporary employee. He states that he was
not informed that he was classified as a temporary
employee when he was rehired.

Adams was assigned to the patch crew, which does
repair work on the city's roads. His supervisor was
James Ivey (white); the patch crew's foreperson was Eric
Senderson (black). Adams has submitted evidence
indicating that Ivey has frequently used racial slurs in
the workplace.

For several years, Adams has possessed a Class A
Commercial Driver's License ("Class A CDL"), which
authorizes him to operate certain large construction
vehicles and tractor-trailers. When he was rehired, he
told Senderson that he wanted to be a truck driver. In
November 2007, a truck-driver position opened up due to
a retirement. The position needed to be filled in

3

December 2007.  Adams applied for the position but was not promoted.  Instead, on November 28, 2007, the City of Montgomery hired Jeremy Jarrell (white),[2] who possessed a Class B CDL.  Although a Class A CDL allows the driver to operate more types of vehicles than does a Class B CDL, the truck-driver position requires only a Class B CDL.

According to the city, Adams was ineligible for the truck-driver position because he was rehired as a temporary employee.  Adams responds that Jarrell had resigned from municipal employment in August 2007.  But, unlike Adams, Jarrell was eligible for re-employment as a permanent employee because his separation period was under two years.[3]

_____

2.  At various points in the record, Jarrell's last name is spelled "Jerrell."  The court goes with the majority of documents in the record and uses the "Jarrell" spelling.

3.  The city notes that Adams applied again for a truck-driver position in April 2008.  The city has submitted evidence showing that it requested additional information from Adams but that he failed to respond.  Without this additional information, the city deemed Adams's application incomplete.  Adams, however, makes

(continued...)

4

On January 14, 2008, Adams filed an intake questionnaire with the Equal Employment Opportunity Commission ("EEOC"). The questionnaire details the allegation of race discrimination in the hiring of Jarrell for the truck-driver position. Adams further reports that he spoke with Tom Provitt, the Assistant Director of the Maintenance Department, who informed him that temporary employees could not be promoted to the truck-driver position.

In February 2008, Adams moved from temporary to permanent employment. Because the city's rules allow temporary employees to serve for only six-months, the shift to permanent status was necessary for Adams to keep his job.

---

(...continued)
only a veiled reference to this failure to promote in his brief's retaliation section and under the heading "denied promotion to Foreman." Adams's Brief (Doc. No. 37) at 31. During the pretrial conference on April 10, 2012, Adams's counsel limited the truck-driver claim to the November 2007 incident.

On May 28, 2008, Adams was told that he was being transferred to the ditch crew, which handles weed cutting and other gardening work along the city's roads. According to an Employee Counseling Record dated May 28, Ivey stated that Adams was "not pulling [his] own weight" on the patch crew.  Ivey specifically criticized Adams for an incident on May 22, when Adams's alleged laziness resulted in other workers carrying his load and a construction job taking longer than planned.  Employee Counseling Record (Doc. No. 38-8) at 2.

Upon learning of this reassignment, Adams left work to file an internal-affairs complaint alleging racial discrimination.  His internal complaint states that "discrimination put a man with Class A CDL on grass." Complaint Form (Doc. No. 38-2) at 2.  Thus, his internal complaint focuses on his reassignment to the ditch crew.[4]

---

4. At times, Adams's brief implies that the transfer to the ditch crew happened after his complaint to internal affairs.  While it appears true that the effective date of the ditch-crew transfer occurred after Adams's complaint, the decision to transfer Adams was

(continued...)

The next day, on May 29, Adams was called in to meet with Ivey and Kim McGough, the Administrative Officer for the Maintenance Department.  Adams was handed the May 28 counseling record that detailed the May 22 incident that precipitated his transfer to the ditch crew.  He was also given a letter of reprimand for taking unapproved sick leave the day before.  According to the reprimand letter, he did not clock out for the day and failed to produce a doctor's note.  Of course, Adams was not on sick leave the prior day; he had left work to file his internal-affairs complaint.  He states that he received permission to leave work early from his supervisor, Sedrick Cross, and that white employees have left work early without disciplinary action being taken.

On June 13, 2008, Adams was promoted to Service Maintenance Worker III ("SMW III").  The city's promotion form states that Adams had "received his CDL license."

_____

(...continued)
made before he filed the complaint.  Indeed, the internal-affairs complaint is premised on the ditch-crew transfer.

Recommendation for Personnel Action (Doc. No. 19-13) at
1.  Adams, however, had his Class A CDL when he was
rehired in August 2007.  The city concedes that the
notation on the promotion form is inaccurate, but asserts
that Adams "could not receive commensurate payment while
classified as a temporary employee or while on
probation."  City's Brief (Doc. No. 20) at 4-5 n.1.

On June 18, Adams filed a formal EEOC charge alleging
race discrimination. While he checked the box for only
race discrimination, his explanation also sets forth
retaliation allegations.  Adams stated in pertinent part
that:

> "I am a Black male.  I was rehired by
> the above employer in August 2007 on the
> asphalt crew with a six (6) temporary
> status.  In October, 2007, I contacted
> my supervisor about a eighteen wheeler
> truck drivers position when the current
> employee holding the position retired at
> the end of the month.  I was told to
> give him a few days to get the paperwork
> processed.  I have had a 'Class A'
> license required for the position since
> 2000 and have been driving a tractor
> trailer since I left the company in
> 2000.  In December 2007, a White male

8

> without a 'Class A' license was rehired
> by the employer and awarded the
> position. <u>Since, then I have received</u>
> <u>several unwarranted disciplinary actions</u>
> <u>by the employer and the supervisor is</u>
> <u>harassing me in the performance of my</u>
> <u>job by trying to assign me work not in</u>
> <u>my job.</u> The harassment continues up to
> this date, June 12, 2008."

First EEOC Charge (Doc. No. 19-1) at 1 (emphasis added).

On August 7, 2008, Adams received a second letter of reprimand for taking an unapproved absence on July 30 without a doctor's note. Letter of Reprimand (Doc. No. 19-16) at 1. He states that he did not come to work because a bad storm had caused trees to fall on his property. As a result of this letter of reprimand and the May 28 and 29 disciplinary actions, he received a three-day suspension without pay on September 3, 2008. Id. at 1-4.

On October 23, 2008, Adams sent letters to Provitt and Gail Gipson, Director of the Maintenance Department, alleging race discrimination. These letters were not formal internal-affairs complaints, like the one Adams

had previously filed.  Adams avers that no one contacted
him to follow up on these letters or conduct an
investigation.

On April 9, 2010, Adams filed a second EEOC charge.
This charge alleged, among other things, that Adams had
suffered retaliatory discrimination.

Finally, on October 29, 2010, Adams filed this
lawsuit alleging race discrimination and retaliation.


### III.  DISCUSSION

The city puts forward two arguments for summary
judgment.  First, the city contends that Title VII's
statute of limitations bars the consideration of some of
the alleged unlawful employment practices.  Second, the
city believes it is entitled to summary judgment on the
merits.  The court addresses each argument as they apply
to the race-discrimination and retaliation claims.

10

A.  Race Discrimination

Adams identifies five racially motivated employment actions: (1) the August 7, 2007, denial of the SMW III position when he was rehired by the city; (2) the November 28, 2007, failure to promote to the truck-driver position; (3) the May 28, 2008, Employee Counseling Record and ditch-crew transfer; (4) the May 29, 2008, letter of reprimand; and (5) the August 7, 2008, second letter of remand and the September 3, 2008, three-day suspension without pay.


1.  Statute of Limitations

Title VII mandates that plaintiffs exhaust their administrative remedies prior to filing suit in federal court.[5]  "In a non-deferral state such as Alabama, the deadline for filing [an administrative] charge is 180 days after the alleged discriminatory act."  Zeigler v.

_____

5.  The city does not raise a statute-of-limitations argument with regards to Adams's § 1981 claims.

11

<u>Alabama Dep't of Human Resources</u>, 710 F. Supp. 2d 1229, 1238 (M.D. Ala. 2010) (Albritton, J.).

The city argues that, because Adams filed his first EEOC charge on June 18, 2008, any claim prior to December 21, 2007, is time barred. Specifically, the city submits that the hiring of Jarrell for the truck-driver position in November 2007 is time barred. Adams, however, filed an EEOC intake questionnaire in January 2008. If this filing constituted a EEOC charge, then the truck-driver claim would not be time barred.

Because Adams's truck-driver claim would not be time-barred under § 1981 and because Adams fails to make out a prima-facie case of race discrimination with regard to the claim, the court declines to address the city's statute-of-limitations argument.

### 2.  Merits

Both Title VII and § 1981 "have the same requirements of proof and use the same analytical framework."

12

Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330
(11th Cir. 1998).  This case, therefore, is governed by
the familiar burden-shifting analysis of McDonnell
Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under the
McDonnell Douglas framework, a plaintiff has the initial
burden of establishing a prima-facie case of unlawful
employment discrimination by a preponderance of evidence.
Id. at 802.  If the plaintiff establishes a prima-facie
case, the burden then shifts to the defendant to rebut
the presumption by articulating a legitimate, non-
discriminatory reason for its employment action.  The
defendant has the burden of production, not of
persuasion, and thus need not convince the court that the
reason advanced actually motivated its action.  Id.

Once the defendant satisfies this burden, "the
presumption of discrimination is eliminated and the
plaintiff has the opportunity to come forward with
evidence, including the previously produced evidence
establishing the prima-facie case, sufficient to permit

13

a reasonable factfinder to conclude that the reasons given by the [defendant] were not the real reasons for the adverse employment decision." Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc) (internal quotation marks omitted). In other words, a plaintiff must show that a defendant's proffered explanation is a mere pretext for discriminatory conduct.

The court now turns to Adams's five claims.

SMW III Position: As the city points out, Adams cannot establish a prima-facie case of race discrimination with regard to the city's failure to hire him in a SMW III position. Adams may establish a prima-facie case of race discrimination in a number of ways, including showing that (1) he is a member of a protected class; (2) he was qualified and applied for the position; (3) he suffered an adverse-employment action (for example, he was rejected); and (4) an equally or less qualified employee who was not a member of the protected class was selected for the position. Combs v. Plantation

14

<u>Patterns</u>, 106 F.3d 1519, 1539 n.11 (11th Cir. 1997).

Adams has not provided any example of a white individual

who was hired with a Class A CDL who was classified as a

SMW III.  Moreover, although Adams contends that Provitt

and Senderson both testified that it was the city's

policy to automatically place individuals with Class A

CDLs in a SMW III position, their depositions do not

support this proposition.  During Senderson's deposition,

for example, the following colloquy ensued:

> "Q: If Willie had his CDL, should he
> have been classified as an SMW three?
>
> "A: If that's the way the rules read, he
> should have been.
>
> "Q: And you understood those were the
> rules?
>
> "A: <u>I said if that's the way the rules
> was.</u>"

Senderson Deposition (Doc. No. 39-5) at 8 (emphasis

added).  Adams has not produced any evidence indicating

that the city has a policy that, upon hiring, an

individual with a Class A CDL is given a SMW III

position.  Thus, Adams has failed to establish a prima-facie case with regards to his SMW III claim.  Finally, Adams was simply not qualified for the position.  As the city notes, it could not promote Adams to the SMW III position until he became a permanent employee with the city six months after his rehire.

In addition, even assuming Adams has established a prima-facie case, the count must conclude that the city's contention that it could not promote him to SMW III until he became a permanent employee is a legitimate, non-discriminatory reason which he has not rebutted with sufficient evidence.

Truck-Driver Position:  Adams's central claim is that he should have been promoted to truck driver in November 2007.  Adams believes that the city engaged in race discrimination when it hired Jarrell, a white former employee who has only a Class B CDL.

The city responds that Adams cannot establish a prima-facie case of race discrimination because he was

16

not qualified for the position.  Specifically, the city
points to the fact that Adams was a temporary employee
and, therefore, was ineligible for the promotion.  The
city's personnel rules provide that an "employee may be
upgraded only after attaining permanent status and must
complete a total of six (6) consecutive months of
employment with the department."  City Rules (Doc. No.
19-4) at 6.  Adams was rehired as a temporary employee
and had worked for the city for only around three and a
half months at the time the truck-driver position was
filled.

Adams retorts that Jarrell had also been separated
from city employment when was he hired as a truck driver.
The city, however, distinguishes between re-hired
employees based upon their length of separation from
municipal employment: "A former or retired employee who
voluntarily separated in good standing may be considered
for re-employment and upon the employee's request his/her
name shall be placed on the re-employment list(s).  <u>Any</u>

<u>former employee who is re-employed more than two years
from the date of separation will be required to
successfully complete a six months probationary period.</u>"
<u>Id</u>. at 4 (emphasis added).  Adams separated from city
employment in August 2004 and was rehired in August 2007,
a gap of three years.  Accordingly, Adams was required to
be rehired as a temporary employee and could not be
promoted during his first six months.  Jarrell had only
separated from city employment in August 2007 and was
eligible for re-hire as a permanent employee.  Montoya
Affidavit (Doc. No. 19-8) at 2.  Adams, therefore, was
not qualified for the truck-driver position when he
applied in November 2007 and cannot establish a prima-
facie case of race discrimination.[6]

<u>Disciplinary Actions</u>: To establish a prima facie case
of discriminatory discipline, Adams must show that: "(1)

---

    6.  Additionally, the court notes the job posting for
the truck-driver position states that an applicant needs
to have one of three types of CDLs: Class A, Class B, or
Class B with tanker endorsement.  Construction Equipment
Operator Job Posting (Doc. No. 19-6) at 9.  Thus, Jarrell
was qualified for the position.

he belongs to a racial minority; (2) he was subjected to
adverse job action; (3) his employer treated similarly
situated employees outside his classification more
favorably; and (4) he was qualified to do the job."
Holifield v. Reno, 115 F.3d 1555, 1162 (11th Cir. 1997)
(per curiam). Adams contends that the following
disciplinaries were racially motivated: (1) the May 28,
2008, Employee Counseling Record and ditch-crew transfer;
(2) the May 29, 2008, letter of reprimand; and (3) the
August 7, 2008, second letter of remand and the September
3, 2008, three-day suspension without pay. The city
makes two arguments as to why Adams has not made out a
prima-facie case with regards to the disciplinaries taken
against him.

The city contends that these disciplinaries are not
tangible-employment actions cognizable under the anti-
discrimination statutes. In Burlington Industries v.
Ellerth, 524 U.S. 742 (1998), the Supreme Court explained
that a "tangible employment action constitutes a

19

significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Id. at 761. Although context specific, a "tangible employment action in most cases inflicts direct economic harm." Id. at 762. Here, Adams was suspended for three days without pay. While a suspension is not the most severe punishment, it still qualifies as a tangible-employment action. Indeed, Adams suffered "direct economic harm." Id.

To be sure, the May 28 counseling record and accompanying ditch-crew transfer, the May 29 reprimand, and the August 7 reprimand might not, by themselves, constitute substantial and material changes in his employment. However, because they factored into the city's decision to suspend Adams, they are also actionable to that extent.

Second, the city submits that Adams has failed to provide a valid comparator.   "Traditionally ... a plaintiff alleging discriminatory treatment was required to show that ... a similarly situated employee who was not a member of her protected class engaged in nearly identical conduct and was not [disciplined]."   Herawi v. State of Ala. Dep't of Forensic Sciences, 311 F. Supp. 2d 1335, 1346 (M.D. Ala. 2004) (Thompson, J.).   However, the plaintiff's burden at the prima-facie stage is not onerous and "there are ways to raise the inference of discrimination other than showing that a similarly situated individual from outside the protected class was treated differently."   Id. at 1347.   "Accordingly, the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case.   Rather, the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th

Cir. 2011).  "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."  Id. (footnote and internal quotation marks omitted).

In assessing whether there is adequate circumstantial evidence of discrimination, a court must remember that Title VII's ambit is not limited to actions that are solely motivated by racial animus.  "Under the 1991 amendments to [Title VII], 'an unlawful employment practice is established when the complaining party demonstrates that race ... was a motivating factor for any employment practice, even though other factors also motivated the practice.' ... [U]nder these amendments, if the employee shows merely that race was a motivating factor, he has established liability and thus may be entitled to some relief."  Hall v. Alabama Ass'n of School Boards, 326 F.3d 1157, 1165 (11th Cir. 2003) (per

curiam) (citations omitted).   In other words, it is enough if race was just 'a' motivating factor behind the city's decision to suspend Adams; race does not have to be 'the' motivating factor.

Here, Adams has produced evidence that race discrimination may have played a role in the May 28 counseling record and decision to transfer, disciplinary actions which, as stated, factored into the three-day suspension.   Adams has submitted substantial evidence that his supervisor, James Ivey, frequently used anti-black racial slurs in the workplace and thus harbored a racial bias against African-Americans.   For instance, Jeremy Jarrell, the white employee who received the truck-driver position in December 2007, states that: "After returning to work for the City of Montgomery in December 2008, I have personally heard James Ivey use the word 'nigger' in the work place on numerous occasions. Since December 2008, I have heard Mr. Ivey use the word 'nigger' too many times to count."   Ivey Affidavit (Doc.

No. 41-4) at 2.[7]  Adams has also tendered evidence dating

back to 1999 and 2000, when Ivey was the subject of

another EEOC discrimination charge filed by Angelo McLean

(black).  McLean's EEOC affidavit from that investigation

alleged that Ivey "frequently and openly called me a

'Nigger' over my obection during the time I was assigned

to the asphalt crew. ... Mr. Ivey called another black

employee, Chico Fletcher, 'boy', 'stupid', and 'Mother

Fucker'."  McLean Affidavit (Doc. No. 38-4) at 4.  Thus,

Adams has painted a picture in which race may have been

a motivating factor in the decision to suspend him, even

---

7.  The court notes that Jarrell's affidavit says
December 2008 instead of December 2007 as the date
Jarrell was rehired.  The court assumes this is a
typographical error.

The city objects to the admission of Ivey's affidavit
because it is unsigned.  However, evidence is admissible
at the summary-judgment stage if it can be presented in
an admissible form at trial.  Adams avers that Jarrell
will testify at trial. Adams further states that his
counsel interviewed Jarrell to prepare the affidavit and
that the lack of a signature is due to Jarrell's recently
moving residences.

though other, non-discriminatory factors played a role as well.  Adams has established a prima-facie case.

The city responds that it issued the May 28 counseling form because Adams was not carrying his weight on the asphalt crew.  The counseling form relies on Ivey's and Cross's interpretations of Adams's work ethic.

Adams has produced evidence to show that the city's proffered rationale is a pretext for race discrimination. The May 28 counseling form was initiated and signed by Ivey, who has a history of using racial slurs in the workplace.  "[A]s a general rule, remarks that show bias are particularly probative of discrimination when they are made by the person charged with making the employment decision."  Herawi, 311 F. Supp. 2d at 1347.  Indeed, Adams has produced evidence showing that Ivey has used racial slurs from 1999 until at least December 2007. Accordingly, Adams has created a genuine dispute of material fact as to whether the May 28 counseling record was motivated by Ivey's racial animus.  Because the

25

city's progressive discipline policy factored the May 28 counseling record into the three-day suspension decision, Adams has shown that a tangible-employment decision was motivated, at least in part, by race discrimination.

Adams's claim related to the September 3, 2008, three-day suspension survives summary judgment. Because the city's progressive discipline policy subsumed the May 28, 2008, employee counseling form, the ditch-crew transfer, the May 29, 2009 letter of reprimand, and the August 7, 2008, letter of reprimand into the suspension decision, those disciplinary actions will also be considered at trial. However, Adams has failed to introduce sufficient evidence to raise a genuine dispute of material fact that the city engaged in race discrimination when it classified him as a SMW I in August 2007 and failed to promote him to truck driver in November 2007.

**B. Retaliation**

Adams points to three examples of retaliation: (1) the May 28 counseling record and transfer to the ditch crew; (2) the May 29 letter of reprimand; and (3) the August 7 second reprimand letter and the September 3 three-day suspension without pay.[8]

**1. Statute of Limitations**

The city asserts that Adams's second EEOC charge starts the statute of limitations on his retaliation claims. According to the city, as the second charge was filed on April 9, 2010, any claims of retaliation prior to October 11, 2009, are time barred.

But the city looks to the wrong EEOC charge. "The starting point of ascertaining the permissible scope of a judicial complaint alleging employment discrimination

---

8. Adams's brief also mentions several failures to promote to foreperson. However, during the pretrial conference on April 10, 2012, Adams informed the court that these claims are being litigated in a separate case. Adams, therefore, is not relying on these failures to promote in this litigation.

is the administrative charge and investigation."
Robinson v. Regions Financial Corp., 242 F. Supp. 2d
1070, 1079 (M.D. Ala. 2003) (Thompson, J.).  As noted
above, Adams's first EEOC charge contained an allegation
of retaliation.  After discussing the city's hiring of
Jarrell for the truck-driver position, Adams states that:
"Since, then I have received several unwarranted
disciplinary actions by the employer and the supervisor
is harassing me in the performance of my job by trying to
assign me work not in my job.  The harassment continues
up to this date, June 12, 2008."  First EEOC Charge (Doc.
No. 19-1) at 1.

The mere fact that Adams failed to check a box
labeled "retaliation" in his first EEOC charge does not
preclude him from raising retaliation claims that
occurred during the first charge's statute of
limitations.  "Not all acts complained of ... need have
been included in the EEOC charge; rather, an employee may
include in her lawsuit a claim for injury resulting from

any practice which was or should have been included in a
reasonable investigative complaint." Robinson, 242 F.
Supp. 2d at 1079 (internal quotation marks omitted).
Moreover, courts often treat retaliation claims
differently from other forms of discrimination because
the EEOC filing itself can be the impetus for the
employer's unlawful act. Cf. Gupta v. East Texas State
University, 654 F.2d 411 (5th Cir. Aug. 28, 1981)
(holding that it is unnecessary to file a second EEOC
charge when the retaliation arises because of the first
EEOC filing).[9]   Here, given the allegations of
"unwarranted disciplinary actions" in the first EEOC
charge, (1) the first charge essentially asserted
retaliation even though the retaliation box was not
checked and (2) Adams's claims of retaliation related to
his ditch-crew transfer and the letter of reprimand would

_____

     9.  In Bonner v. City of Prichard, 661 F.2d 1206,
1209 (11th Cir. 1981) (en banc), the Eleventh Circuit
adopted as binding precedent all of the decisions of the
former Fifth Circuit handed down prior to the close of
business on September 30, 1981.

have been uncovered by a reasonable investigation growing out of the first charge.

Because Adams's first EEOC charge determines the statute of limitations on the retaliation claims, only acts prior to December 21, 2007, are time barred.  Adams has not alleged any retaliatory acts prior to this date.

### 2.  Merits

To make out a prima-facie retaliation claim under Title VII, a plaintiff must establish: "(1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that there is some causal relation between the two events." Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1363 (11th Cir. 2007) (per curiam).  Once a plaintiff establishes a prima-facie case, "the employer must proffer a legitimate, non-retaliatory reason for the adverse employment action." Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998).  At the final stage of the

Title VII retaliation inquiry, "[t]he plaintiff bears the ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct." Id. The court concludes that there are genuine disputes of material fact as to whether the May 29 and August 7 letters of reprimand and the September 3 three-day suspension constituted retaliation.

As noted above, on May 28, 2008, Adams was informed that he was being transferred to the ditch crew. He subsequently left work to file an internal-affairs complaint alleging race discrimination. The next day, May 29, he was called into a meeting with Ivey (who had a history of using racial slurs in the workplace and had just been accused of race discrimination) and given a letter of reprimand for taking unapproved sick leave while filing his internal-affairs complaint. It is undisputed that Adams engaged in statutorily protected action (filing a complaint) and there is a close temporal

relationship between the complaint and the letter of reprimand.

The city contends that summary judgement is appropriate as to the May 29 reprimand letter. First, the city asserts that the letter does not constitute a materially adverse-employment action. For a retaliation claim (unlike a race-discrimination claim), an employee need not suffer an ultimate employment decision like termination or failure to promote. Rather, a materially adverse-employment action is one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Crawford v. Carroll, 529 F.3d 961, 974 (11th Cir. 2008). See also Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 64 (2006) (noting that Title VII's "antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment"). A reasonable employee could have interpreted the letter and meeting as a stern

32

warning not to file future complaints.  The court finds that Adams has established a prima-facie case of retaliation.

Next, the city responds that it had a legitimate, non-discriminatory reason for issuing the letter of reprimand: Adams violated municipal policy by taking sick leave without a doctor's note.  On this point, Adams has created a genuine dispute about a material fact.  He testified that he never claimed to be taking sick leave and that his new supervisor, Cross, gave him permission to leave work.  Adams further notes that employees frequently take time off work without doctor's notes and are not disciplined for it.  The one-day gap between the filing of the internal affairs complaint and the letter of reprimand raises a strong possibility that the city's proffered explanation is a pretext for retaliatory motive.  And, perhaps most significantly, unlike many cases where an unrelated rules violation and subsequent punishment form the basis of a retaliation claim, here

the city disciplined Adams for the time he took off from work to file his internal-affairs complaint.  The causal connection between the statutorily protected activity and the materially adverse-employment action is, therefore, particularly strong.

Because the August 7 reprimand letter is so similar to and came so closely on the heels of the May 29 letter (for which the evidence of retaliation is substantial), the August 7 letter survives summary judgment as well. Also, because the May 29 letter of reprimand factored into the decision to suspend Adams for three days in September 2008, the three-day suspension survives summary judgment as well.[10]

Adams has, therefore, introduced sufficient evidence to raise a genuine dispute of material fact that the city engaged in retaliation when it issued the May 29 and

_____

10.  The court also notes the closeness-in-time between Adams's complaints--May 29 to internal affairs and June 18 to the EEOC--and the initiation of the process to suspend him, which started on August 7 and was only finalized in September.

August 7 letters of reprimand and imposed the September 3 suspension.  However, the court's holding does not extend to the May 28 counseling record and decision to transfer Adams to the ditch crew, for they were made prior to the internal-affairs complaint and, therefore, cannot form the basis of a retaliation claim.[11]

*   *   *

Accordingly, it is ORDERED that:

(1) Defendant City of Montgomery's motion for summary judgment (Doc. No. 19) is granted as to plaintiff Willie Adams's race-discrimination claims arising out of the August 7, 2007, denial of the SMW III position and the

---

11.    Adams's brief does not argue that the EEOC intake questionnaire filed in January 2008 triggered the retaliatory discrimination.  As such, that potential argument is deemed waived.  See Johnson v. Andalusia Police Dep't, 633 F. Supp. 2d 1289, 1299 (M.D. Ala. 2009) (Thompson, J.) (deeming claim not mentioned in party's brief to be waived); cf. Access Now, Inc. v. Southwest Airlines, Co., 385 F.3d 1324, 1330 (11th Cir. 2004) ("[T]he law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.").

November 28, 2007, failure to promote to the truck-driver position.

(2) Said motion is denied as to plaintiff Adams's race-discrimination claims arising out of the September 3, 2008, three-day suspension and all prior disciplinary actions that factored into that decision.

(3) Said motion is granted as to plaintiff Adams's retaliation claims arising out his transfer to the ditch crew and the issuance of a counseling record on May 28, 2008.

(4) Said motion is denied as to plaintiff Adams's retaliation claims arising out of his receipt of letters of reprimand on May 29 and August 7, 2008, and his suspension on September 3, 2008. These claims will go to trial.

DONE, this the 24th day of April, 2012.

　　　　　　　　　　　　/s/ Myron H. Thompson　　
　　　　　　　　　UNITED STATES DISTRICT JUDGE