IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| WILLIE ADAMS, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
|     v. | ) | 2:10cv924-MHT |
| | ) | (WO) |
| THE CITY OF MONTGOMERY, | ) | |
| | ) | |
|     Defendant. | ) | |

<u>OPINION AND ORDER</u>

In this employment-discrimination case, an eleventh-hour discovery revelation forced the continuation of the trial and precipitated a protracted dispute between the parties.  Three days before the scheduled trial date, defendant City of Montgomery disclosed over 100 pages of documents to plaintiff Willie Adams.  Some of these documents relate to the city's internal-affairs investigation into Adams's race-discrimination claim, a point that has been hotly contested by the parties.  Additionally, the city has asserted the attorney-client privilege and work-product doctrine for two never disclosed documents and a set of audio recordings.  Adams

has filed six motions seeking various forms of relief including sanctions, in-camera review of the allegedly privileged documents and recordings, and additional discovery. For the reasons that follow, these motions will be granted in part and denied in part.


## I.  BACKGROUND

### A.  Overview of the Litigation

To provide context to this discovery dispute, the court will first give a truncated synopsis of the facts and procedural history of this litigation, with particular attention to Adams's remaining claims.[1]

Plaintiff Adams, an African-American, first worked for the City of Montgomery from September 2003 to August 2004. After a stint as a long-distance truck driver, he returned to work for the city on August 10, 2007. Upon his re-employment, he was assigned to the patch crew,

---

1. For a thorough discussion of this suit, see Adams v. City of Montgomery, 2012 WL 1414979 (M.D. Ala. Apr. 24, 2012) (Thompson, J.).

which does repair work on the city's roads. His
supervisor was James Ivey (white). Adams has submitted
evidence indicating that Ivey has frequently used racial
slurs in the workplace.

On May 28, 2008, Adams was told that he was being
transferred to the ditch crew, which handles weed cutting
and other gardening work along the city's roads.
According to an Employee Counseling Record dated May 28,
Ivey stated that Adams was "not pulling [his] own weight"
on the patch crew. Ivey specifically criticized Adams
for an incident on May 22, when Adams's alleged laziness
resulted in other workers carrying his load and a
construction job taking longer than planned. Employee
Counseling Record (Doc. No. 38-8) at 2.

Upon learning of this reassignment, Adams left work
to file an internal-affairs complaint alleging racial
discrimination. His internal-affairs complaint states:
"[D]iscrimination put a man with Class A CDL on grass.
According to consevation [sic] a job doing I was told to

3

speed up, but wasn't told to do so." Complaint Form (Doc. No. 38-2) at 2.    Thus, his internal-affairs complaint focuses on his reassignment to the ditch crew.

The next day, on May 29, Adams was called in to meet with Ivey and Kim McGough, the Administrative Officer for the Maintenance Department.  Adams was handed the May 28 counseling record that detailed the May 22 incident that precipitated his transfer to the ditch crew.  He was also given a letter of reprimand for taking unapproved sick leave the day before.  According to the reprimand letter, he did not clock out for the day and failed to produce a doctor's note.  Of course, Adams was not on sick leave the prior day; he had left work to file his internal-affairs complaint.  He states that he received permission to leave work early from his new supervisor, Sedrick Cross, and that white employees have left work early without disciplinary action being taken.

On August 7, 2008, Adams received a second letter of reprimand for taking an unapproved absence on July 30

4

without a doctor's note.  Letter of Reprimand (Doc. No. 19-16) at 1.  Adams states that he did not come to work because a bad storm had caused trees to fall on his property.  As a result of this letter of reprimand and the May 28 and 29 disciplinary actions, he received a three-day suspension without pay on September 3, 2008. Id. at 1-4.

On October 29, 2010, Adams filed this lawsuit alleging race discrimination and retaliation.

On April 24, 2012, this court entered an opinion and order granting summary judgment in part and denying it in part.  Adams v. City of Montgomery, 2012 WL 1414979 (M.D. Ala. Apr. 24, 2012) (Thompson, J.).  That order denied the city's request for summary judgment on Adams's race-discrimination claims arising out of the September 3 three-day suspension and all prior disciplinary actions that factored into that decision.  The order also denied the city's request for summary judgment on Adams's retaliation claims arising out of his receipt of the May

29 and August 7 letters of reprimand and his September 3 suspension.  This court granted the city's request for summary judgment on all other claims--some of which have been omitted here for the sake of brevity. Significantly, this court granted summary judgment in favor of the city on Adams's retaliation claim involving the May 28 employee counseling record because it was dated the same day Adams filed his internal-affairs complaint.


B.  Discovery Dispute

Two sets of documents are at the core of this discovery dispute.[2]  An explanation of the two sets is necessary to understand how the discovery dispute unfolded.

The first set of documents, the "Alexander documents," Bates Stamps 388 to 417, relates to an Equal

_____

2. Personnel records of Adams's co-workers were also involved in the discovery dispute, though Adams does not dwell on these documents in his arguments for sanctions.

Employment Opportunity Commission (EEOC) charge filed by Samuel Alexander.  During discovery, Adams requested access to other discrimination charges filed against the city's maintenance department.  The city proffered Alexander's charge as the sole example in its records. Although at various times the city asserted these documents were protected by the attorney-client privilege, the city has now withdrawn its objection and concedes that these documents are discoverable.  As such, the court will address the Alexander documents only as they relate to the issue of sanctions.

The second set of documents, the "Lilley documents," Bates Stamps 418 to 503, raise more serious concerns. These documents contain information relating to the city's investigation of Adams's internal-affairs complaint.  According to Adams, these documents revealed several important facts:

> ● The identity of the city's investigator: Walter Lilley, Jr. Previously, Adams's attorneys believed that city attorney C. Michael "Mickey"

7

McInnish conducted the internal-affairs investigation.

• James Ivey, who issued the May 28 employee counseling record and attended the May 29 disciplinary meeting, was interviewed by Lilley about Adams's race-discrimination complaint <u>sometime</u> on May 29. This fact was disclosed by signed statements indicating the dates on which Lilley interviewed witnesses. It is unclear if Ivey was notified about the interview (or sat for the interview) before or after his meeting with Adams. Although initially claiming attorney-client privilege for the signed witness statements, the city has since dropped its objection as to these documents.

• Lilley tape recorded his interviews with Ivey, Cross, and three other supervisors. These audio recordings have never been turned over to Adams and the city maintains that they are protected by the work-product doctrine.

In addition to (1) the audio recordings, the city claims the following two undisclosed documents are privileged: (2) correspondence of May 28, 2008, from McInnish to maintenance department supervisor Gail Gipson; and (3) an investigative report of June 3, 2008, from Lilley to Gipson that was reviewed and approved by

8

McInnish.  Pursuant to an order, this court conducted an
in camera review of the two documents and the audio
recordings.

   C.  Chronology of the City's Evolving Positions

   Based on the documentary evidence provided by both
parties, the court has constructed the following
chronology of the instant discovery dispute and the
city's shifting position on asserting the attorney-client
privilege and the work-product doctrine.  For the
purposes of this chronology, the court will divide the
Lilley documents into two groups:  the undisclosed Lilley
documents, which include the May 28 McInnish-Gipson
correspondence, the June 3 investigative report, and the
audio recordings; and the disclosed Lilley documents,
which include all the other Lilley documents.

9

<u>January 21, 2011</u>: The city makes its initial disclosures under Fed. R. Civ. P. 26(a)(1). Lilley is not listed as a potential witness.

<u>March 8</u>: In a response to interrogatories, the city states that Samuel Alexander has filed an internal complaint and an EEOC charge.

<u>July 5</u>: The city informs Adams that it objects to the deposition of McInnish.

<u>August 11</u>: Adams informs the city that he still wants to depose McInnish. However, no formal motion to compel is filed, and McInnish is never deposed.

<u>August 15</u>: Adams's paralegal requests the Alexander documents.

<u>August 30</u>: The city's attorney contends she prepared the Alexander documents and the non-privileged Lilley documents for disclosure. Defense counsel further asserts that she prepared a privilege log identifying the May 28 McInnish-Gipson correspondence, the June 3 investigative report, and the audio recordings. Her

10

evidence for this belief is that the documents were Bates Stamped and placed on a CD-ROM; it is her personal policy to Bates Stamp documents that will be disclosed.  Defense counsel believes that these documents were printed out on this date but that she waited until September 8 to mail them.  Defense counsel has submitted computer "metadata" showing that these files were last edited on August 30.

September 8: Defense counsel believes that this is the date the Alexander documents, the disclosed Lilley documents, and the privilege log were mailed to plaintiff's counsel.  The city concedes that it has been unable to find a signed copy of these documents or a certificate of service.  Adams's attorneys, however, unequivocally state that they never received these documents.  They also point out that the unsigned certificate of service on one of these documents says March 2011.

May 3, 2012, at 6:57 p.m.: Adams's attorneys email the city about documents with Bates Stamps in the 400

11

range, contending to have received only documents up to Bates Stamp 387.

     May 3 at 7:07 p.m.: The city responds by email and informs Adams that he will receive everything the following morning.

     May 4 at 10:34 a.m.:  The city emails Adams to confirm that it would be sending Bates Stamps 388 to 447 and that it would also be sending personnel files of Ivey and Jeremy Jarrell (a co-worker of Adams).  12:45 p.m.: A conference call was held between the parties' attorneys regarding unresolved discovery issues.  3:24 p.m.: The city sends an email with Bates Stamps 418 to 503, thus providing the disclosed Lilley documents but not the Alexander documents.  Defense counsel contends that these documents "were provided following the August 2011 depositions."  Defense counsel, however, notes that she "cannot locate an executed copy of our privilege log" and "cannot determine whether we actually provided the privilege log."  Doc. No. 81-1 at 2.  Defense counsel's

email also includes the three current assertions of privilege (which coincide with the privilege log). <u>4:00 p.m.</u>: The city's paralegal sends Bates Stamps 494 to 503. <u>4:09 p.m.</u>: The city's paralegal sends documents related to Jarrell's employment. <u>4:21 p.m.</u>: Adams emails the city again requesting documents with Bates Stamps 388 to 417 (the Alexander documents). <u>4:46 p.m.</u>: The city's paralegal tells Adams that defense counsel has stepped out but that she will respond when she gets back. <u>5:30 p.m.</u>: The city's paralegal again states that defense counsel will respond soon. <u>6:03 p.m.</u>: The city's counsel responds to Adams's attorneys and states: The Alexander documents were "bates stamped by the staff, but I pulled them out before they were sent. It was one of the Legal Department's EEOC cases which is outside the scope of discovery." City Email (Doc. No. 81-12) at 2. This statement indicates that defense counsel had never previously disclosed the Alexander documents.

<u>May 5 and 6</u>: Adams files motion for in camera review of Alexander documents and the undisclosed Lilley documents.  Adams also files motions for sanctions.

<u>May 6</u>: The city requests that <u>all</u> documents with Bates Stamps above 387 be returned pursuant to Fed. R. Civ. P. 26(b)(5)(B), the "Clawback" provision.

<u>May 7</u>: Scheduled date for trial.  The city files a brief under the assumption that it had never previously disclosed the Lilley documents and stating that it believed the privilege log had never been sent.  Later that day, at an in-person conference with the court, the city continues to assert attorney-client privilege for all documents with Bates Stamps 387 and higher. Specifically, the city contends that the Lilley documents were created "in anticipation of litigation."  Adams requests a trial continuance, and the city agrees that a continuance is warranted to sort out the discovery dispute.  The court grants a continuance.

14

<u>May 11</u>:  The city changes its story.  Now, the city contends that it did provide the Alexander and disclosed Lilley documents, as well as a privilege log, on September 8, 2011, but concedes that it has no proof of this.   The city also withdraws its assertions of attorney-client and work product privileges as to the Alexander documents and the disclosed Lilley documents. The city's sole remaining privilege claims relate to the undisclosed Lilley documents (the May 28 McInnish-Gipson correspondence, the June 3 investigative report, and the audio tapes).  The city files a privilege log as to these documents (which it claims is the original privilege log from September 8).  The city provides an affidavit from McInnish in which he states that he considered the Adams investigation "in anticipation of litigation" because Adams had indicated on his internal-affairs complaint that he was currently pursuing litigation.

<u>May 15</u>: Pursuant to a court order, the city submits the undisclosed Lilley documents for in camera review.

15

_May 16_: The court holds an evidentiary hearing on the pending motions.  McInnish testifies about the policies and practices of the city's legal department and internal affairs division.  McInnish elaborates on his reasons for deeming the Adams internal-affairs investigation "in anticipation of litigation."  Defense counsel also testifies concerning her failure to disclose documents.

Based on this chronology, the court makes the following findings.  The court does not credit the city's contention that it provided to Adams the Alexander documents, the disclosed Lilley documents, and the privilege log at any point prior to May 2012.  Defense counsel has provided evidence that she intended and planned to mail these documents to Adams's attorneys, but there is no certification or other proof that they were ever sent in August or September 2011.  Moreover, Adams's attorneys' position on the subject has been consistent.  The emails between the parties reveal defense counsel's confusion as to the status of disclosures and assertions

of privilege.  The court further notes that the city has
repeatedly changed its position as to whether the
Alexander and Lilley documents were properly disclosed or
privileged.


## II.  DISCUSSION

Two issues need to be resolved.  First, this court
needs to determine whether the city's remaining
assertions of privilege are valid.  Second, the court
needs to decide what sanctions, if any, are appropriate.
The court will address whether to order the depositions
of Lilley and McInnish in its sanctions discussion.


### A.  Privilege

The city asserts that the May 28 correspondence and
the June 3 report are protected by both the attorney-
client privilege and the work-product doctrine and that
the audio recordings are protected by the work-product
doctrine.  Given that "the work-product doctrine is

17

distinct from and broader than the attorney-client privilege," United States v. Nobles, 422 U.S. 225, 238 n.11 (1975), the court first addresses the work-product doctrine and concludes that the city's contention is valid.

Under Federal Rule of Civil Procedure 26(b)(3)(A), a "party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." The work-product doctrine, therefore, has two elements: to be shielded from discovery the document must be (1) produced by an attorney or her agent and (2) created in anticipation of litigation.  The doctrine is based on the notion, as Justice Jackson eloquently put, that, "Discovery was hardly intended to enable a learned profession to perform its functions either without wits or on wits borrowed from the adversary."  Hickman v. Taylor, 329 U.S. 495, 516 (1947) (Jackson, J., concurring).

As a preliminary matter, the fact that Lilley, a non-lawyer, conducted the interviews and drafted the report does not vitiate the application of the doctrine.  The work-product doctrine is "grounded in the realities of litigation in our adversary system." Nobles, 422 U.S. at 238.  As such, it recognizes that "attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial."  Id.

The closer question is whether the undisclosed Lilley documents were prepared in anticipation of litigation. Documents that are prepared "in the ordinary course of business or pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes" are not protected.  Comm. Notes. Fed. R. Civ. P. 26(b).

The city points to several factors as evidence that the undisclosed Lilley documents were prepared in anticipation of litigation.  The city's primary argument comes from Adams's internal-affairs complaint itself.

19

The form asks: "Have you begun any legal action against this person or department?"  To which Adams replied "yes" and, when prompted for an explanation, stated: "discrimination."  Internal-Affairs Complaint (Doc. No. 19-29) at 1.[3]  The city has also submitted an affidavit from McInnish, in which he states that he deemed the investigation "in anticipation of litigation" because of Adams's statement on the internal-affairs complaint form. McInnish Affidavit (Doc. No. 98-10) at 1.  At the hearing on May 16, 2012, McInnish reasserted that Adams's listing of initiated litigation was the reason he designated the investigation "in anticipation of litigation."

After inspecting the documents and recordings submitted for in-camera review, the court is convinced, and so finds factually, that the undisclosed Lilley documents were made in anticipation of litigation.

---

3.   This is true to a point: at the time Adams made his internal-affairs complaint he had filed a EEOC intake questionnaire but had not yet submitted a formal EEOC charge.  Nonetheless, the city had a good-faith belief that Adams had initiated litigation.

McInnish's correspondence to Gipson notes the potential for litigation, emphasizes the need for confidentiality, and specifically references the work-product doctrine. McInnish-Gipson Correspondence (Doc. No. 101-2) at 2. Furthermore, the investigative report and the tape recordings cover far more ground than the sole issue raised in Adams's internal-affairs complaint: the ditch-crew transfer. As such, they focused on issues likely to arise in litigation.

To be clear, the court emphasizes that its ruling is fact-bound and narrow. The court is not saying that all the city's internal-affairs investigations are in anticipation of litigation; nor can the city routinely contend such in good faith. On this point, Adams correctly emphasizes that the city conducts internal-affairs investigations into all complaints of discrimination. What, if anything, then separates the Adams investigation from the routine investigation?

21

Here, the undisclosed Lilley documents had a dual purpose:  They were prepared pursuant to the city's policy of investigation, but also, specifically, with an eye to this anticipated litigation.   In determining whether a dual-purpose document is protected, the former Fifth Circuit explained in binding precedent that "as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation," it receives work-product protection.  <u>United States v. Davis</u>, 636 F.2d 1028, 1040 (5th Cir. Feb. 12, 1981).[4]  Other appellate courts have adopted a potentially broader "because of" standard, which asks whether a document was prepared or obtained because of the prospect of litigation.  <u>See</u>, <u>e.g.</u>, <u>United States v. Roxworthy</u>, 457 F.3d 590, 593 (6th Cir. 2006) (adopting the "because of" test and collecting cases); <u>Pacific Gas & Elec. Co.</u>

---

4. In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

v. United States, 69 F. Cl. 784, 790-91 (2006)
(discussing the "motivating purpose" and "because of"
standards); United States v. Adlman, 134 F.3d 1194, 1198-
1203 (2d Cir. 1998) (collecting cases and adopting the
"because of" standard).

Whether these two standards are consistent or
overlapping is difficult to determine in the abstract.
Indeed, as Davis recognized, "It is admittedly difficult
to reduce to a neat general formulation the relationship
between preparation of a document and possible litigation
necessary to trigger the protection of the work product
doctrine." 636 F.2d at 1040. Moreover, a court must be
quite careful in crafting a legal standard, or choosing
between two arguable applicable ones, "for fea[r] that it
may contain implications not now apparent." Hickman v.
Taylor, 153 F.2d 212, 223 (3rd Cir. 1946).

In any event, the court need not resolve this dispute
(to the extent one exists) between whether the old Fifth
Circuit standard should still be binding in light of

later developments or the new standard should be adopted, because the result would be the same under either standard: the documents are covered by work-product protection, as they were produced, and this court finds so factually, with the "motivating purpose" for and "because of" anticipated litigation.  As stated, the undisclosed Lilley documents cover far more ground than the sole issue raised in Adams's internal-affairs complaint.  The undisclosed Lilley documents were therefore the product of much more than a routine investigation; they were, instead, the product of a much more expansive investigation in anticipation of litigation.

Finally, the work-product doctrine can be overcome if Adams can demonstrate that the sought-after documents are otherwise nonprivileged and relevant pursuant to Fed. R. Civ. P. 26(b)(1) and that he "has substantial need for the materials to prepare [his] case and cannot, without undue hardship, obtain their substantial equivalent by

other means." Fed. R. Civ. P. 26(b)(3)(A).  Because it appears, at this time, that Adams is free to ask the other witnesses at trial about their internal-affairs interview and depose Lilley, <u>see</u> <u>infra</u> Section II.B, he has not, at this time, demonstrated a "substantial need" or "undue hardship" for the undisclosed Lilley documents.

Thus, the undisclosed Lilley documents (the May 28 McInnis-Gipson correspondence, the June 3 investigative report, and the audio recordings) are protected by the work-product doctrine.

B.  Sanctions

Adams believes that the Alexander and disclosed Lilley documents should have been produced earlier in the litigation.  While numerous documents were not timely disclosed, most of the prejudice arises from the disclosed Lilley documents.  Specifically, Adams asserts he would have deposed Lilley and developed a more refined timeline for his retaliation claim.  The disclosed Lilley

documents raise the possibility that Ivey's behavior in the May 29 disciplinary meeting and the May 28 employee counseling record may have been affected by the internal-affairs complaint. Adams also submits that he would have used the signed witness statements during depositions. Adams emphasizes that the city failed to produce a privilege log and, therefore, improperly withheld all the Lilley documents.

The city puts forward two arguments against sanctions. First, the city attempts to show that it did produce earlier the disclosed Lilley and Alexander documents and the privilege log. For the reasons detailed above, see supra Section I.C, the court does not credit the city's explanation of events. The city, moreover, concedes that it cannot prove it produced the documents earlier, and Adams's attorneys have been unyielding in their assertion that they never received these documents before the eve of trial.

Alternatively, the city believes that Adams's counsel 'slept on their rights' by failing to bring up these issues in the fall of 2011. Here, the city is seeking protection under Fed. R. Civ. P. 37(c)(1), which provides that sanctions are inappropriate if the failure to disclose was "substantially justified" or "harmless."

As to the disclosed Lilley documents, the city notes that several witnesses mentioned an internal-affairs investigator. Adams's counsel aver that they believed this was McInnish, whom they sought to depose. Moreover, only one witness (Ivey) actually named Lilley during a deposition and, even then, he did so in passing and was unsure about the investigator's identity. This brief reference hardly qualifies as reasonable notice given the fact that the city had an obligation to inform Adams's attorneys of Lilley's existence and role in the internal-affairs investigation.

While this trial would have occurred as scheduled if Adams's attorneys had been more attentive, discovery was

27

hindered by the city's failure to disclose.  The signed witness statements--which the city has now conceded are not protected--would have been quite helpful to Adams's attorneys in conducting depositions and constructing a timeline for the retaliation claim.  Furthermore, the city has failed to articulate any justification--much less a substantial one--for its behavior other than negligence.  The city's argument is properly construed as a plea for reduced sanctions, not an absolution of its discovery violations.

Federal Rule of Civil Procedure 37 gives this court ample discretion in imposing sanctions.  Options include granting a default judgment, prohibiting the city from supporting or opposing designated claims or defenses, staying further proceedings, and ordering payment of reasonable expenses.  Adams requests sanctions ranging from a default judgment to an order requiring the depositions of Lilley and McInnish.

In determining the appropriate discovery sanction, courts should consider: "(1) Defendant's reasons for failing to provide the information sooner; (2) the importance of the information; (3) Plaintiff's need for time and Plaintiff's ability to respond to the proffered evidence; and (4) the court's ability to alleviate unfair prejudice through alternative measures." Stallworth v. E-Z Serve Convenience Stores, 199 F.R.D. 366, 369 n.3 (M.D. Ala. 2001) (DeMent, J.). Here, the court concludes that the city has provided no valid excuse for its attorney's negligent conduct throughout discovery and her shifting privilege assertions; the information improperly withheld--particularly the disclosed Lilley documents--went to the heart of Adams's retaliation claim; and, yet, Adams's attorneys should have recognized the city's discovery violations prior to May 2012.

In light of the above discussion and the fact the city's remaining assertions of privilege are valid, the court imposes the following sanctions:

• Adams's attorneys will be permitted
to depose city investigator Lilley.
Because Adams's attorneys had no
reasonable notice of Lilley's existence,
a deposition is an appropriate cure for
the city's discovery violations. Given
the work-product doctrine, the
deposition cannot go into Lilley's
investigative report. Nevertheless,
Adams's attorneys are permitted to ask
questions such as whether Lilley
interviewed Adams, how and when the five
witnesses were notified of their
interviews, and when those interviews
were conducted.

• Adams's attorneys will not be
permitted to depose McInnish. They were
on notice of McInnish's involvement in
the internal-affairs investigation in
July 2011 but declined to file a motion
to compel when faced with an objection.

• Adams will be permitted to amend his
witness list to include Lilley.

• The city will pay Adams's reasonable
costs and attorneys' fees related to
Lilley's deposition because the city
failed to notify Adams about Lilley's
role in the internal-affairs
investigation. The city will also pay
half of Adams's reasonable costs and
attorneys' fees for the six motions
addressed in this opinion (Doc. Nos. 80,
81, 83, 88, 90 & 94) as well as for the
evidentiary hearing of May 16, 2012.
The court finds that these sanctions are

30

appropriate because of the city's
initial failure to disclose the
Alexander documents, the non-privileged
Lilley documents, and the privilege log.
These sanctions are further appropriate
given the city's inconsistent positions
on whether the Alexander and Lilley
documents were disclosed in September
2011 and whether these documents were
privileged. The court, however, awards
only 50 % of Adams's reasonable costs
and attorneys' fees because Adams's
attorneys should have been more diligent
in noticing these discovery problems in
the fall of 2011 and brought them to the
court's attention before the eve of
trial.


                    *   *   *


   Accordingly, it is ORDERED that:

   (1) Plaintiff Willie Adams's motion for a protective

order (Doc. No. 88) is denied because defendant City of

Montgomery has withdrawn its privilege assertions as to

the disclosed documents.

   (2) Plaintiff Adams's motion for in-camera review

(Doc No. 80) is granted to the extent that it seeks

in-camera review of the May 28 McInnish-Gipson

correspondence, the June 3 investigative report, and the

audio recordings because the court has already ordered an in camera review of these documents and recordings (Doc. No. 100).   To the extent that Adams's motion for in-camera review seeks the disclosure of these documents and recordings, the motion is denied because the documents and recordings are protected under the work-product doctrine.

(3) Plaintiff Adams's motion to compel a privilege log (Doc. No. 90) is denied because defendant City of Montgomery has now produced a privilege log.

(4) Plaintiff Adams's motion to compel the deposition of Walter Lilley, Jr., and C. Michael "Mickey" McInnish (Doc. No. 94) is granted as to Lilley and denied as to McInnish.

(5) Plaintiff Adams's motions for sanctions (Doc. Nos. 81 & 83) are granted as outlined in Section II.C of the accompanying opinion and denied in all other respects.   The parties are given until May 31, 2012, to agree upon the amount defendant City of Montgomery owes

32

plaintiff Adams pursuant to the opinion in this case and
to file that agreement with the court; if they cannot
agree, plaintiff Adams is allowed until June 4, 2012, to
file a motion setting forth the appropriate costs and
attorneys' fees he contends defendant City of Montgomery
owes him pursuant to the opinion.

DONE, this the 29th day of May, 2012.

_____/s/ Myron H. Thompson_____
UNITED STATES DISTRICT JUDGE